# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS

---

### UNION SULPHUR CO. v. PERCY et al.

#### (Circuit Court of Appeals, First Circuit. July 19, 1910.)

#### No. 862.

1. SHIPPING (§ 181*)—DEMURRAGE—LAY DAYS FOR LOADING—CONSTRUCTION OF CHARTER PARTY.

A schooner was chartered to carry a cargo of sulphur from Sabine Pass, Tex. The charter provided that lay days for loading should commence "from the time the vessel is ready to receive * * * cargo and notice thereof is given. * * * Vessel to take turn in loading * * * if required." The latter clause was written in, while the former was in the printed form. Such provisions were expressly called to the attention of the owner's agents, who also knew that the charterer was chartering other vessels, and that it had but one loading berth at Sabine Pass. When the schooner arrived for loading and gave notice of her arrival, there were other vessels ahead of her, and she was obliged to wait her turn. *Held*, that her lay days did not commence until she received her berth; there being no unnecessary delay.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. § 181.*]

2. PRINCIPAL AND AGENT (§ 97*)—AUTHORITY OF AGENT TO DETERMINE—DEMURRAGE.

Where, after a vessel was loaded, a question of demurrage arose, a telegram from the charterer directing its local agent to "indorse on bills of lading when lay days commenced and when vessel loaded. Demurrage, if any, settled at destination," did not confer upon such agent authority to determine the question of lay days under the charter, but merely to indorse the facts with respect to the arrival and loading of the vessel, and his indorsement stating the number of days for which the vessel was entitled to demurrage was unauthorized, and not binding on the charterer.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 97.*]

Appeal from the District Court of the United States for the District of Maine.

Suit in admiralty by Samuel R. Percy and others, as owners of the schooner Cora F. Cressy, against the Union Sulphur Company. Decree for libelants (173 Fed. 534), and respondent appeals. Reversed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

180 F.—1

Howard S. Harrington (D. Roger Englar, on the brief), for appellant.

Edward C. Plummer, for appellees.

Before COLT, PUTNAM, and LOWELL, Circuit Judges.

COLT, Circuit Judge.   This is an action for demurrage brought by the owners of the schooner Cora F. Cressy under a charter party dated January 11, 1907.  The vessel was chartered by the respondent, the Union Sulphur Company, to carry a cargo of sulphur from Sabine Pass, Tex., to Baltimore, Philadelphia, or Portland.

The Cressy arrived at Sabine Pass and reported March 18, 1907, but she did not reach her berth and begin loading until April 8th. This detention was caused by the previous arrival of four other vessels chartered by the respondent to carry cargoes of sulphur, so that the Cressy had to take her turn in loading; the respondent having only one loading berth at Sabine Pass.

The claim for demurrage turns upon the single question when the lay days began to run.   The libelant contends that they began to run when the Cressy arrived and reported on March 18th.   On the other hand, the respondent insists that in case the vessel was required to take her turn in loading, owing to the previous arrival of other vessels, the lay days did not begin to run until the vessel reached her berth on April 8th.

If the lay days commenced to run on March 18th, the libelant is entitled to the demurrage claimed, while, if the lay days commenced to run on April 8th, there was no wrongful detention, and the libel must be dismissed.

'The lay day clause in the charter party reads as follows:

"It is agreed that the lay days for loading and discharging shall be as follows (if not sooner dispatched) commencing from the time the vessel is ready to receive or discharge cargo, and notice thereof is given to the parties of the second part.  *Shippers to furnish cargo at the rate of 300 tons per day, Sundays and holidays excepted, and discharge 300 tons per day, Sundays and holidays excepted.  Vessel to take turn in loading and discharging if required.*"

In the charter party the first portion of this clause is a part of the printed form used by the parties, and the latter portion, in italics, is the typewritten matter inserted by the parties before signing.

It will be observed that this clause contains two provisions relating to lay days, the printed provision, which says that the lay days commence when the vessel arrives and gives notice, and the subsequently inserted typewritten provision that the vessel is to take her turn in loading if required.   Effect is to be given to both these provisions, if possible, but, if they are contradictory, the inserted written matter, as a general rule, must govern, as expressing the intention of the parties. In our opinion, however, these two provisions are neither contradictory nor inconsistent when construed in the light of the circumstances existing at the time the charter party was made.   It was known to the parties at that time that the respondent had only one berth for loading at Sabine Pass, and it was also known that the respondent was at that time chartering other vessels to proceed to Sabine Pass for the

purpose of carrying cargoes of sulphur, as appears from the following stipulation:

"It is stipulated, by and between the proctors for the respective parties herein, that at the time of the execution of the charter party upon which this action is brought, it was understood by the parties thereto that the Union Sulphur Company was at that time chartering other vessels to proceed to Sabine for the purpose of carrying sulphur cargoes."

There is also this further stipulation as to the arrival of four of these vessels prior to the arrival of the Cressy:

"It is hereby stipulated and agreed by and between the proctors for the respective parties to the above-entitled suit, that the steamer Hector and the schooners Harwood Palmer, Edward H. Cole and Mary F. Barrett had arrived at Sabine, Texas, and reported to the Union Sulphur Company for cargo, prior to the 16th day of March, 1907."

The evidence shows that the provisions of the charter party were expressly brought to the knowledge of the libelant. Mr. Jones, of the firm of James W. Elwell & Co., ship brokers, who acted as the agent of both parties during the negotiations, testifies as follows:

"Q. May I ask if prior to the execution of this charter party you had submitted these conditions to Messrs. Winslow & Co.? A. Yes, sir.

"Q. Had you submitted to Messrs. Winslow & Co. the provision that the vessel was to take her turn in loading and discharging, if required? A. Yes, sir.

"Q. At the time you executed this charter party on behalf of J. S. Winslow & Co. did you understand that the Sulphur Company had only one loading berth at Sabine? A. Yes.

"Q. Did you understand that the Union Sulphur Company had only one loading berth at Sabine? A. Yes, sir.

"Q. And you understood that the loading provided for in the charter party was on the basis of shipper's furnishing as the charter party states, 300 tons per day? A. Yes.

"Q. And, as far as the owners of the vessel were concerned, that was the only rate that you were interested in? A. Yes.

"Q. And you relied only upon the shipper's having facilities to furnish that amount of cargo per day? A. Yes, sir."

Mr. Clark, of the firm of J. S. Winslow & Co., ship brokers, agents for the libelant, testified as follows:

"Q. As a matter of fact, did Elwell's people sign this charter party both for the Cressy and the Sulphur people? A. They signed it for us as agents for the Cressy. * * *

"I authorized Mr. Jones, of J. W. Elwell & Co., to close with the Cora F. Cressy by conversation over the phone on or about January 11, 1907."

There is nothing in the record to show that Mr. Jones did not act with fairness towards the libelant during the negotiations; nor is there anything to show that Mr. Clark did not fully approve the provisions of the charter party.

As for the contention of counsel that the libelant was misled with respect to the loading capacity of the plant at Sabine Pass, we need only refer to Mr. Clark's testimony, where he says:

"Well, I usually rely on the agreements we make, and that agreement [in the charter party] was 300 tons a day."

Taking the whole record as it stands, and interpreting the lay-day clause of the charter party in the light of the surrounding circumstan-

ces and conditions, there can be no reasonable doubt as to the meaning of the provisions relating to lay days. These provisions mean that the lay days were to commence when the Cressy arrived and reported, if there were no other vessels ahead of her, but, in case other vessels had reported first, and she was required to take her turn (a condition which was subsequently found to exist at Sabine Pass, and which it had been anticipated might arise), then necessarily the lay days were not to commence until the Cressy had come to her berth. Any other construction of this lay-day clause would fail to give effect to the words "vessel to take turn in loading and discharging if required," and thus render this specific condition written into the charter party meaningless.

It is not claimed that there was any delay in loading the Cressy after she came to the berth, nor any delay in loading the vessels ahead of her after they reached the berth. The claim of the libelant is based solely on the proposition that the Cressy's lay days commenced when she reported on March 18th, notwithstanding the provision in the lay-day clause that she was to take her turn in loading if required.

The remaining question is what effect, if any, is to be given to the telegram sent to respondent's agent at Sabine Pass, and his subsequent indorsement on the Cressy's bills of lading, in determining the rights of the parties under the lay-day clause in the charter party. When the Cressy was loaded and ready to clear on April 11th, her master, Capt. Haskell, made a claim for demurrage, and refused to sign the bills of lading until the claim had been adjusted.

In this situation the following telegram was sent by Mr. Jones to C. H. Dickinson, local agent of the respondent at Sabine Pass, and it is agreed that this dispatch was sent by authority of the respondent:

"April 12, 1907.

"C. H. Dickinson,

"C/o The Union Sulphur Co.,

"Sabine, Texas.

"Schooner Cressy endorse on bills lading when lay days commenced and when vessel loaded. Demurrage if any settled at destination.

"Jas. W. Elwell & Co."

Upon the receipt of this telegram Mr. Dickinson made the following indorsement upon the bills of lading:

"Sabine, Texas, April 12, 1907.

"The schooner Cora F. Cressy was ready for cargo at 9.00 a. m., on March 18, 1907. Finished loading at noon, April 11, 1907. Assuming that her cargo consists of 3000 tons, her lay days expired on April 11, 1907, at 9.00 a. m. as per charter party, dated January 11, 1907; hence demurrage is due this vessel for 13 days and 3 hours. Union Sulphur Company,

"C. H. Dickinson, Agent."

The meaning of the telegram sent to Dickinson appears to be free from any serious doubt. He was directed to indorse on bills of lading when the lay days commenced and when the vessel was loaded, and the question of demurrage, "if any," was to be settled at destination; that is, Dickinson was directed to state the facts with respect to the arrival and loading of the vessel, leaving the question of the right to any demurrage to be adjusted when the vessel reached her destination.

This is the natural construction of the telegram. On the other hand, it would be, in our opinion, a strained and forced construction of this telegram to hold that it conferred upon Dickinson the authority to determine the question of lay days under the charter party, leaving only the payment of the amount found due, if anything, to be settled when the vessel reached her destination.

The indorsement which Dickinson made on the bills of lading was not in strict accordance with the telegram, and on its face it is ambiguous and contradictory. If, as stated, the "lay days expired on April 11, 1907," the day the Cressy was loaded and ready to clear, there could be no claim for demurrage, and hence no warrant for saying that "demurrage is due this vessel for 13 days and 3 hours." If, however, we are to treat the date, April 11th, as an error, and that Dickinson intended to write March 28th in place of April 11th, which would make the whole indorsement consistent, then it is sufficient to say that he had no authority under the telegram sent him to bind his principal as to any claim for demurrage. Dickinson was a mere local agent of the respondent at Sabine Pass, where its loading plant was located, and there is no evidence other than the telegram that he was authorized to act for the respondent on the question of its rights under the charter party. Nor is there any evidence that the respondent subsequently ratified the Dickinson indorsement. In our opinion the ultimate rights of the parties under the charter party were in no way finally determined by the telegram and indorsement. The legal effect of these acts was simply to postpone the settlement of any demurrage claim until the Cressy reached her destination.

The decree of the District Court is reversed, and the case is remanded to that court with directions to dismiss the libel, with costs; and the appellant recovers its costs of appeal.